UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOSHUA SMITH & <br> MONICA POLCHES, <br>         Plaintiffs, <br> v. <br> TOWN OF MACHIAS, et al., <br>         Defendants. | Docket no. 1:17-CV-00320-GZS |

**ORDER ON DEFENDANT WILLIAM SCULL'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant William Scull's Motion for Summary Judgment (ECF No. 26). For reasons briefly explained herein, the Court DENIES IN PART and GRANTS IN PART the Motion.

**I. LEGAL STANDARD**

"A district court may only grant summary judgment when the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017) (citations omitted), cert. denied, 138 S. Ct. 1311 (2018). Thus, on the record before the Court, it must appear "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). "[S]ummary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II. FACTUAL BACKGROUND

On August 6, 2015, having already consumed a number of alcoholic beverages, Joshua Smith was transported by car to the Irving gas station on Main Street in Machias, Maine. He arrived at about 10:40 p.m. with the intention of purchasing more beer. The Irving clerk refused to sell Smith alcohol and asked Smith to leave the store and the property. Smith spoke loudly both when inside and outside the store. While his recollection is less than clear, he admits that he probably dared the clerk to call the police and used explicit language in responding to the clerk's request that he leave the premises.

At approximately 11:00 p.m. on August 6, 2015, William Scull, then an on-duty Machias police officer, received a call from dispatch informing him that there was an individual at the Irving gas station who the clerk wanted off the property. Scull proceeded to the gas station arriving about five to ten minutes after Smith had completed his interaction with the clerk. Scull located a man, who was several inches taller than and considerably heavier than himself, near the gas station. Based on his training and experience as a law enforcement officer in dealing with intoxicated individuals, Scull concluded that the man was intoxicated. The man admitted to Scull that he had been asked to leave the property by the clerk. Scull asked the man for identification and informed him that the gas station clerk had authorized the police to order this intoxicated man to leave the property and to refrain from returning.

Pursuant to Machias Police Department policy, Scull intended to provide the man with a written warning consistent with the oral warning he was conveying to him. Although the man told Scull he had identification, he did not provide Scull with any documents that would identify him. When Scull again asked the man for his identification, he indicated that he did not have it anymore but that Scull knew who he was. Scull advised the man that he did not know the man's identity. The man eventually told Scull his name was Josh Smith. Because Smith appeared confused, Scull again explained that he was attempting to serve Smith with a trespass notice but that Smith was not under arrest. Scull asked Smith to accompany him to his police vehicle so that Scull could complete the trespass notice and Smith did so. Once at his vehicle, Scull instructed Smith to stand by the front wheel of the police cruiser while Scull completed the paperwork on the hood.

In response to Scull's multiple requests for identification, Smith took several items out of his pocket, including his phone, and indicated that his identification was there. Scull also patted down Smith's pockets. Scull remained concerned as to what Smith might do given his obvious intoxication, his loud, erratic behavior and his size. Scull advised Smith that he was placing him in handcuffs until he had completed the trespass notice citing the safety of both of them. Smith asked several times if he was under arrest; each time, Scull advised him that he was not under arrest, but that he was being detained until Scull could serve the trespass notice on him.

Even with handcuffs on Smith asked several times if he was free to leave; each time, Scull advised him that he wanted him to stay where he was until Scull could serve the trespass notice on him. Scull advised him to lower his voice and that he would be arrested for disorderly conduct if he did not comply. Smith again asked if he was under arrest; Mr. Scull advised him that he was

being detained here until Scull could confirm his identity for the trespass notice. Despite these instructions, Smith began to walk away with his hands handcuffed behind his back.

At this point, approximately five minutes into Scull's interaction with Smith, Scull dropped his phone and hip tossed Smith face first into the parking lot. Smith lost consciousness and sustained an injury to his face above his right eye. After turning Smith on to his side, Smith regained consciousness and Scull helped Smith off the ground. Scull seated him in the back seat of his police vehicle. Scull asked Smith if he wanted medical attention and he eventually said he did not. Scull advised Smith that if he did not want medical attention he could leave the Irving property but that he needed to go directly off the property. Smith then left the parking lot without being issued any written trespass notice. Scull remained at the gas station to complete some paperwork. Within fifteen minutes of his departure, Smith returned to the gas station and indicated to Scull that he wanted an ambulance.

Scull called dispatch and asked that an ambulance be sent to the Irving gas station. While the two men waited for the ambulance, Smith became very agitated. Scull reminded Smith of the disorderly conduct warning and told him that if he did not control himself he would be arrested for disorderly conduct. Despite these warnings, Smith raised his voice and used obscenities and drew the attention of the gas station patrons. Just before the ambulance arrived, Smith became very loud. As a result of his conduct, Scull advised Smith that he was placing him under arrest for disorderly conduct and Scull placed Smith in handcuffs behind his back. Ultimately, the ambulance arrived and transported Smith to the hospital. After being treated at the hospital, Scull transported Smith to the Washington County Jail and summonsed him for Disorderly Conduct and Terrorizing. These charges were later dismissed for insufficient evidence.

## III. DISCUSSION

Before turning to the merits of the summary judgment motion, the Court briefly addresses the issue of the video of the incident (ECF No. 31-3), which Plaintiffs filed as part of their response to the pending Motion for Summary Judgment on July 23, 2018. In its Reply (ECF No. 39), Defendant argues that the Plaintiffs should be precluded from relying on the video recording as a sanction for failing to comply with their obligations under Federal Rule of Civil Procedure 26(a)(1)(A). Citing Rule 37(c)(1) and Harriman v. Hancock, 627 F.3d 22 (1st Cir. 2010), Defendant argues that "mandatory preclusion" is the "baseline rule" and "required sanction" for Plaintiffs' failure to comply with its disclosure obligations. Id. at 29. However, as noted by the First Circuit, the appropriate sanction for any discovery violation must take into account a variety of factors, including "party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence." Harriman, 627 F.3d at 30. In its Sur-Reply (ECF No. 43), Plaintiffs' counsel has explained that his file reflects a forwarding of initial disclosures to Defendant's counsel via email on December 29, 2017. However, counsel acknowledges that he cannot now confirm that the disclosures were in fact sent and received that day. With respect to harmlessness, Plaintiffs' counsel notes that the Irving security camera video was initially produced to Smith by the Washington County District Attorney's office in connection with the 2015 criminal charges that were later dropped. A Maine Municipal claims representative acknowledged receipt of the video prior to August 2017. The video also was referenced in Smith's January 20, 2016 Notice of Claim. Plaintiffs' counsel further represents that the video was provided to Defense counsel on December 28, 2017 and thereafter

5

referenced as part of the proposed summary judgment record in an April 17, 2018 email between counsel. (See Davidson Aff. (ECF No. 43-1), PageID #s 397-99.) In short, Defendant was well aware of the video even in the absence of timely delivered initial disclosures. While the video arguably only serves to reinforce the testimony Smith proffers by way of affidavit (ECF No. 31-1), given his admittedly intoxicated state, the video is a critical piece of evidence.[1] For his part, Defendant was aware of the video and had an opportunity to review it prior to filing his motion for summary judgment. Given the entire record and procedural history of this litigation, the Court concludes that Plaintiffs have met their burden of showing that any failure to produce the video as part of their initial disclosures was harmless.[2]

Turning to the merits, having reviewed the video of the incident, along with the entire summary judgment record, the Court concludes that there are triable issues of material fact regarding whether Scull used excessive force in detaining Smith. It was clearly established at the time of the incident that it was unlawful for an officer to use excessive force to detain a non-violent person suspected of committing only a minor crime. See Morelli v. Webster, 552 F.3d 12, 22–24 (1st Cir. 2009); see also Ciolino v. Gikas, 861 F.3d 296, 303-04 (1st Cir. 2017) (collecting cases in which officers used significant force against non-violent but uncooperative persons suspected of non-violent crimes). On the record before the Court, a reasonable jury could readily conclude that Scull's significant use of force went beyond the type of contact, such as a "gratuitously violent shove," that is within the ambit of qualified immunity. See Morelli, 552 F.3d at 25. Therefore, the Court determines that Scull is not entitled to qualified immunity with respect to Plaintiff

---

[1] While the Court concludes that the video is admissible for purposes of summary judgment, Defendant is free to renew any evidentiary objections to the video's admission at trial via a timely motion in limine.

[2] The Court notes that it would have potentially considered alternative sanctions for Plaintiffs' failure to comply with his initial disclosure obligations had Defendant raised the issue at some time prior to the filing of his August 6, 2018 Reply.

Smith's excessive force claims pursuant to the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4682, and 18 U.S.C. 1983 (Counts I & VII).

Because an officer who uses excessive force is not immune from suit under that Act, Scull is also not entitled to discretionary function immunity under the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. §§ 8101-8118. See Blackstone v. Quirino, 309 F. Supp. 2d 117, 130 (D. Me. 2004).

The Court determines that it would be improper to grant summary judgment on Smith's claim for assault and battery (Count II), which is intimately connected with his excessive force-based claims. Finally, the Court also determines that it would be improper to grant summary judgment on Plaintiff Smith's state law claim for intentional infliction of emotional distress (Count VI), which also derives from the same set of facts underlying the excessive force-based claims.

To the extent Smith brings a claim for "unlawful search and seizure" pursuant to the MCRA, the Court also determines that there are triable issues regarding whether Plaintiff Smith was subject to an unlawful de facto arrest and/or was arrested without probable cause.[3] There are also triable issues of fact regarding his false imprisonment claim (Count IV) given that a state law false imprisonment claim may be grounded on an officer's use of excessive force. See Nadeau v. State, 395 A.2d 107, 116 (Me. 1978).

However, regarding Smith's state law claims for false arrest and malicious prosecution (Counts III & V), the Court determines that Scull is entitled to summary judgment because he was acting within the scope of his discretion as a police officer in his interactions with Plaintiff Smith. See Blackstone, 309 F. Supp. 2d at 130-31 (discretionary function immunity protects police officers from civil liability for malicious prosecution and for warrantless arrests in circumstances

---

[3] The Court notes that Plaintiff Smith's § 1983 claim as pled is explicitly limited to a claim of excessive force. (See Complaint (ECF 3-2), PageID #s 20-21.)

where the existence of probable cause is ambiguous); see also Maddocks v. Portland Police Dep't, No. 2:15-CV-00168-JAW, 2017 WL 401181, at *7 (D. Me. Jan. 30, 2017), report and recommendation adopted, No. 2:15-CV-00168-JAW, 2017 WL 2225227 (D. Me. May 19, 2017) ("Law enforcement officers are immune under state law from liability where the conduct giving rise to the claim involves the performance of a discretionary function. . . . Because the record lacks any evidence to support Plaintiff's excessive force claim, the officers' use of handcuffs was within their discretion and is not actionable."). Even assuming that there is evidence that Scull acted in "bad faith," this does not defeat the absolute immunity created by Section 8111(1)(C) of the MTCA. See Carey v. Bd. of Overseers of the Bar, --- A.3d ---, 2018 ME 119, ¶ 22 (citing Grossman v. Richards, 722 A.2d 371, 374 (Me. 1999)).

Regarding the claims for Loss of Consortium (Count IX) and Damages (Count X), the Court does not deem it necessary to rule on the specific issues raised by Defendant at this stage of the proceeding. To the extent Defendant contends that Plaintiff Polches' loss of consortium claim is limited by the proposition that "loss of consortium is not recoverable under Section 1983," Defendant can renew his Motion as to this issue if and when the matter proceeds to a determination of damages. (Def. Mot. (ECF No. 26), PageID # 246.)

### IV. CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion (ECF No. 26) as to Counts III and V and DENIES the Motion as to Counts I, II, IV, VI, VII, IX, and X.

SO ORDERED.

                         /s/ George Z. Singal  
                         United States District Judge

Dated this 22nd day of October, 2018.